**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Criminal Action No. 25-cr-00011-NYW-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JORGE SIGALA-BARAY,

      Defendant.

---

## ORDER ON MOTION TO SUPPRESS

---

Defendant Jorge Sigala-Baray ("Defendant" or "Mr. Sigala-Baray") was charged with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) after a firearm was found during a search of his person. [Doc. 1; Doc. 18 at 1]. He argues that the pat-down search violated his Fourth Amendment rights, such that evidence of the firearm and statements flowing from the search must be suppressed. *See* [Doc. 18 (the "Motion to Suppress")]. The Court held an evidentiary hearing on the Motion to Suppress on May 14, 2025. [Doc. 36]. For the reasons set forth in this Order, the Motion to Suppress is respectfully **GRANTED**.

## BACKGROUND

On August 10, 2024, Sterling Police Department officer Kyle Taylor ("Corporal Taylor")[1] pulled Mr. Sigala-Baray over in a Ford Expedition for a broken taillight. [Doc. 18-

---

[1] Corporal Taylor is a corporal in the Sterling Police Department as of December 2024. [Hearing Tr. at 2:22–24].

1 at 3]. The traffic stop was effectuated at dusk, shortly before 8:00 p.m., on a public street. [Doc. 18-2 at 19:51:46].[2] While he was pulling the car over, Corporal Taylor asked dispatch to run the following license plate attributable to the Expedition: BPI B24. [*Id.* at 19:51:29].

Corporal Taylor approached the vehicle and told Defendant, who was in the driver seat, and Sasha Sarmiento ("Ms. Sarmiento"), who was in the front passenger seat, that the taillight was broken; Ms. Sarmiento replied, "I know, this is my car." [*Id.* at 19:51:50]. Mr. Sigala-Baray began pulling up his driver's license on his phone, [*id.* at 19:52:00], and Corporal Taylor asked Ms. Sarmiento if she had "the insurance for [her] car," [*id.* at 19:52:03]. As she was riffling through her purse, Ms. Sarmiento replied: "You know, I don't think I do, but I do have insurance, and I don't know where my registration is." [*Id.* at 19:52:05]. Corporal Taylor asked Ms. Sarmiento if she could look her insurance up on her phone or if she could locate an email showing that she was "plated." [*Id.* at 19:52:10]. Ms. Sarmiento continued looking through her purse as Corporal Taylor and Mr. Sigala-Baray made small talk. [*Id.* at 19:52:22].

About one minute after asking for proof of insurance, Ms. Sarmiento provided Corporal Taylor with an Allstate insurance document, suggesting it was "[her] dad's." [*Id.* at 19:53:09]. Corporal Taylor took the document, said he would "see what [he could] do" with it, and took the insurance paper back to his patrol car. [*Id.* at 19:53:16]. In his car, Corporal Taylor asked dispatch to "send down" for insurance on the car, [*id.* at 19:53:51], which means that he requested "a record of the last time . . . valid insurance was

---

[2] When citing to video exhibits, the Court cites to the timestamp appearing in the top right-hand corner of the video, rather than the timestamp displayed by the media player.

produced" for the vehicle, [Hearing Tr. at 25:16–26:19].  In the meantime, other officers arrived and positioned themselves around the perimeter of the vehicle.  [Doc. 18-2 at 19:54:10]; *see also*, *e.g.*, [*id.* at 19:56:17 (showing another officer standing at the passenger door)].  At some point, Corporal Taylor was informed by dispatch that the license plate on Ms. Sarmiento's Ford Expedition were tied to a Ford F-150.  [Hearing Tr. at 4:25–5:6].[3]  However, it was later revealed that this was because two digits in the license plate number had been transposed by dispatch, and the license plates on the Ford Expedition were properly registered to the Ford Expedition.  [*Id.* at 27:24–29:8].

Corporal Taylor then approached the vehicle again—about three minutes after taking the insurance document back to his patrol car—and asked if Ms. Sarmiento and/or Mr. Sigala-Baray had any proof of insurance for the Expedition, as the insurance provided was for a Ford Escape.  [Doc. 18-2 at 19:56:09].  Ms. Sarmiento picked up her phone and began looking for applicable insurance documents.  [*Id.* at 19:56:22].  About 30 seconds later, Corporal Taylor told Mr. Sigala-Baray and Ms. Sarmiento that they needed to step

---

[3] It is not entirely clear from the record when Corporal Taylor learned of the mismatched license plate.  Corporal Taylor suggested at the suppression hearing that he learned the license plate did not match before he approached the vehicle and spoke with Mr. Sigala-Baray.  *See* [Hearing Tr. at 4:25–5:6].  However, the video evidence shows that Corporal Taylor reported the license plate number to dispatch as he was pulling his patrol vehicle over, [Doc. 18-2 at 19:51:29], and he then immediately parked and exited his car and approached the vehicle driven by Mr. Sigala-Baray, [*id.* at 19:51:34–50].  In addition, Corporal Taylor testified that he "mentioned the plates coming back to [an] F-150" in his initial interaction with Mr. Sigala-Baray, [Hearing Tr. at 5:6], but the video evidence does not establish that Corporal Taylor mentioned the plates during the initial interaction, *see* [Doc. 18-2 at 19:51:50–53:30].  Based on the video evidence, Corporal Taylor did not mention the plate discrepancy until he approached the vehicle for a second time.  [*Id.* at 19:57:00].  The Court thus can only assume, by drawing reasonable inferences from the video evidence, that Corporal Taylor was informed that the plates came back to an F-150 during the time he was speaking to dispatch in his patrol car, *after* his initial interaction with Mr. Sigala-Baray.

out of the car so he could check the VIN, as the plates were coming back to a different car.  [*Id.* at 19:56:55].

Mr. Sigala-Baray stepped out of the car with takeout food in one hand and his phone in the other.  [*Id.* at 19:57:15].  As he stepped out of the car, Corporal Taylor put his hands on Mr. Sigala-Baray's body, held his left arm, and told him that he would be searched because he has been "known to carry weapons."  [*Id.* at 19:57:21].  Corporal Taylor frisked Mr. Sigala-Baray and found a gun in his waistband, [*id.* at 19:57:26], and Mr. Sigala-Baray was immediately placed under arrest, [*id.* at 19:57:45].  In his incident report, Corporal Taylor stated:

> Jorge is a well-known violent offender, and it has been common knowledge that he may be carrying a gun on him.  Recently, SPD case: 24-06235, a claim was made that Jorge had shot multiple rounds at an individual, with the claims not corroborated on scene.
>
> I talked to Jorge and his passenger, Sasha Sarmiento[.]  Sasha claimed the truck was her father's, but they had no registration or current insurance for it.  The tabs also displayed expired 03/24.
>
> As I attempted to get this information, Jorge started being overly nice to me, offering me a bite of his food and wanting to eat his food and laughing.  Jorge is not normally this friendly.
>
> Knowing Jorge was known to carry a gun, I asked if he was, and Jorge laughed it off saying that he was not and was trying to be better, as he was a father.
>
> . . .
>
> Ofc. Trevor Troy and Cpl. Danyelle Hass arrived on scene to cover me, as Dispatch had advised that the plates on the truck were possibly fictitious and for a white Ford F150.
>
> I approached Jorge and Sasha, told them about the possible issue with the plates and that I was going to check the VIN on the vehicle to confirm the status.  Sasha got out with them thinking her father may have mixed up the plates with one of his other trucks.

As Jorge exited the truck I stopped him, held his left arm and told him that before he walked away, I was going to pat him down for weapons, because he was known to carry a gun. Jorge tried to pull away but did submit to the pat-down without much issue.

[Doc. 18-1 at 3].

Defendant was charged with a violation of 18 U.S.C. § 922(g)(1). [Doc. 1]. On April 11, 2025, Mr. Sigala-Baray moved to suppress evidence of the gun and statements arising out of the search, arguing that the frisk of his person violated his Fourth Amendment rights. [Doc. 18]. The Government opposes the Motion to Suppress, [Doc. 20], and Mr. Sigala-Baray has filed a reply, [Doc. 31].

## LEGAL STANDARDS

The Fourth Amendment to the United States Constitution "protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 62 (1992) (quoting U.S. Const. amend. IV). "For a search . . . to be reasonable, it must ordinarily be supported by a warrant based on probable cause," *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021), and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment," *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation omitted). A warrantless search "is reasonable only 'if it falls within a specific exception to the warrant requirement.'" *United States v. Kendall*, 14 F.4th 1116, 1121–22 (10th Cir. 2021) (quoting *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021)). The reasonableness of a search is evaluated "on the basis of the facts as they existed at the time" of the search, *United States v. Jacobsen*, 466 U.S. 109, 115 (1984), and the Government bears the burden of demonstrating that an exception to

the warrant requirement applies, *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021).

## ANALYSIS

The Government raises two separate bases to justify Corporal Taylor's warrantless frisk of Mr. Sigala-Baray.  First, it argues that Corporal Taylor had probable cause to arrest Defendant for insurance-based misdemeanors, such that the search was a lawful search incident to arrest.  [Doc. 20 at 3–5].  In the alternative, the Government asserts that Corporal Taylor had reasonable suspicion that Defendant was armed and dangerous, so the frisk of his person was reasonable.  [*Id.* at 5–10].  The Court addresses both arguments below.

## I.    Probable Cause

Probable cause to arrest "exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  *United States v. Sanchez*, 13 F.4th 1063, 1073 (10th Cir. 2021) (quotation omitted).  Probable cause means a "fair probability"—something more than a "bare suspicion," but less than a preponderance of the evidence.  *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022).

"Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer."  *United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991).  In evaluating whether there was probable cause to arrest, the Court views the circumstances "in their totality rather than individually," must view the facts in "context to determine whether rational inferences can be drawn from

them," and cannot ignore facts "that militate against" probable cause.  *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004) (quotation omitted).

The Government argues that the pat-down search was a lawful search incident to arrest[4] because officers had probable cause to arrest Mr. Sigala-Baray for a violation of Colo. Rev. Stat. § 42-4-1409(2) or (3).[5]  [Doc. 20 at 5–6].  Subsection (2) provides that "[n]o person shall operate a motor vehicle or low-power scooter on the public highways of this state without a complying policy or certificate of self-insurance in full force and effect as required by law."  Colo. Rev. Stat. § 42-4-1409(2).  Subsection (3), meanwhile, states that "when requested to do so following any lawful traffic contact or during any traffic investigation by a peace officer, an owner or operator of a motor vehicle . . . shall present to the requesting officer immediate evidence of a complying policy or certificate of self-insurance in full force and effect as required by law."  Colo. Rev. Stat. § 42-4-1409(3)(a).

Reviewing all of the circumstances in their totality, including those that militate against probable cause, *Valenzuela*, 365 F.3d at 897, the Court concludes that at the time of the frisk, a reasonable officer would not have had probable cause to arrest Mr. Sigala-

---

[4] "[A] search incident to arrest can . . . precede the arrest if probable cause for the arrest preceded the search."  *United States v. Sanchez*, 555 F.3d 910, 920 (10th Cir. 2009).

[5] The Government actually cites § 42-4-1409(1), which applies to motor vehicle *owners*. *See* Colo. Rev. Stat. § 42-4-1409(1) ("No owner of a motor vehicle or low-power scooter required to be registered in this state shall operate the vehicle or permit it to be operated on the public highways of this state when the owner has failed to have a complying policy or certificate of self-insurance in full force and effect as required by law.").  Because the evidence does not suggest that Mr. Sigala-Baray owned the vehicle, the Court assumes the Government intended to cite to § 42-4-1409(2), which applies to motor vehicle *operators*.  *See* Colo. Rev. Stat. § 42-4-1409(2); *see also* [Doc. 20 at 4 ("In Colorado, police have statutory authority to arrest individuals that operate a vehicle without valid insurance.")].

Baray for a violation of either § 42-4-1409(2) or § 42-4-1409(3)(a).  The *entire* pre-frisk encounter, from when Corporal Taylor first approached the vehicle to when he instructed Mr. Sigala-Baray and Ms. Sarmiento to exit it, lasted roughly five and a half minutes.  As recounted above, for about two of those minutes, Ms. Sarmiento was looking for proof of insurance.  [Doc. 18-2 at 19:52:05–53:20, 19:56:10–57:03].  For the remainder of the brief encounter, Mr. Sigala-Baray and Ms. Sarmiento were waiting on Corporal Taylor to return after he said he would "see what [he could] do" with the insurance documentation Ms. Sarmiento provided.  [*Id.* at 19:53:25–56:10].  Indeed, for essentially the entire encounter, Ms. Sarmiento was either (a) looking for proof of insurance, or (b) waiting on Corporal Taylor to return from his patrol car.  [*Id.* at 19:53:16].  At no time did Corporal Taylor suggest that he was concerned about the time it was taking Ms. Sarmiento to find proof of insurance or that he was contemplating arresting Mr. Sigala-Baray—who was clearly not the owner of the car—for lack of insurance.

"[S]ubsection (3) of the statute is violated when, upon request by a peace officer during a traffic investigation, a motor vehicle operator fails to 'present to the requesting officer immediate evidence of a complying policy or certificate of self-insurance in full force and effect as required by law.'"  *People v. Tun*, 486 P.3d 490, 496 (Colo. App. 2021) (quoting Colo. Rev. Stat. § 42-4-1409(3)(a)).  To "fail" means "[t]o be deficient or unsuccessful; to fall short of achieving something expected or hoped for."  *Fail*, Black's Law Dictionary (12th ed. 2024); *cf. People v. Janousek*, 871 P.2d 1189, 1196 (Colo. 1994) (relying on dictionary definitions to define "terms of common usage").  At the time Mr. Sigala-Baray was frisked, neither Mr. Sigala-Baray nor Ms. Sarmiento had *failed* to present evidence of a valid insurance policy, as Ms. Sarmiento was still actively searching

for proof of insurance at the time Corporal Taylor decided to frisk Defendant. There was thus no probable cause to arrest Defendant for a violation of § 42-4-1409(3)(a). And for this same reason, given Ms. Sarmiento's assurance that she had insurance for the car, her ongoing search for proof of insurance, and the brief length of the encounter, there was no probable cause at the time of the frisk to believe that Mr. Sigala-Baray was operating the vehicle "without a complying [insurance] policy." Colo. Rev. Stat. § 42-4-1409(2); *see also People v. Moran*, 983 P.2d 143, 148 (Colo. App. 1999) (explaining that § 42-4-1409(2) "makes it illegal to knowingly operate a 'vehicle on the public highways of this state' without motor vehicle insurance").

Courts "presume that the [Colorado] General Assembly intends a just and reasonable result when it enacts a statute." *People v. Sandoval-Candelaria*, 321 P.3d 487, 491 (Colo. 2014) (citing Colo. Rev. Stat. § 2-4-201(1)(c)); *see also People v. Desantiago*, 409 P.3d 389, 391 (Colo. App. 2014) (Colorado courts "will not construe the language of a statute in such a manner as to lead to an absurd, unreasonable, or illogical result."). A finding of probable cause in these circumstances—where Mr. Sigala-Baray and Ms. Sarmiento had been afforded only two minutes to search for proof of insurance and Ms. Sarmiento was still in the process of searching for insurance documents at the time of the frisk—would require an unreasonable and unjust interpretation of § 42-4-1409(2) and (3)(a), and the Court cannot conclude that probable cause for an arrest exists under the circumstances of this case. Stated differently, in light of all of the relevant circumstances, a reasonable officer would *not* have believed that there was probable cause to arrest Mr. Sigala-Baray for a violation of the statute at that moment in time.

*Sanchez*, 13 F.4th at 1073.  The Government cannot justify the frisk on this basis, and the Court turns to the Government's alternative argument.[6]

## II.   Reasonable Suspicion

"Once a vehicle has been lawfully detained pursuant to a valid traffic stop, the officers may order the driver and passengers out of the car without violating the Fourth Amendment."   *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (citing *Arizona v. Johnson*, 555 U.S. 323, 331 (2009)).  An officer may then conduct a pat-down search of the driver or other occupants "upon reasonable suspicion that they may be armed and dangerous." *Arizona v. Johnson*, 555 U.S. at 331.  "The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003) (quotation omitted).

Whether there was reasonable suspicion to conduct a search is a question of law for the Court, *United States v. Sandoval*, 29 F.3d 537, 544 (10th Cir. 1994), and the Government bears the burden of proving the reasonableness of an officer's suspicion, *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011).  "A pat-down search is justified when 'a reasonably prudent officer in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Torres*, 987 F.3d 893, 904 (10th Cir. 2021) (quoting *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012)) (cleaned up).  Reasonable suspicion is not an "onerous standard" and "requires considerably less than a preponderance of the evidence and obviously less

---

[6] Because the Court has concluded that there was no probable cause to arrest Mr. Sigala-Baray for failure to provide proof of insurance, the Court need not address his argument under *Knowles v. Iowa*, 525 U.S. 113 (1998).  *See* [Doc. 31 at 10].

than probable cause to effect an arrest." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (cleaned up). On the other hand, "officers cannot rely on inchoate and unparticularized suspicions or hunches" to demonstrate reasonable suspicion. *United States v. Daniels*, 101 F.4th 770, 776 (10th Cir. 2024) (cleaned up). To justify the frisk, the Government must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

The Court views the factors relevant to the reasonable suspicion analysis in their totality, rather than assessing of each piece of evidence in isolation. *Daniels*, 101 F.4th at 776. The Court considers "whether the facts available to the . . . officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) (cleaned up). "All factors, 'mitigating and aggravating,' must be considered in the totality of the circumstances." *Daniels*, 101 F.4th at 776 (quoting *United States v. Johnson*, 364 F.3d 1185, 1193 (10th Cir. 2004)). "Given the specialized training and experience that law enforcement officers have, [courts] generally defer to their ability to distinguish between innocent and suspicious behavior, but deference becomes inappropriate 'when an officer relies on a circumstance incorrigibly free of associations with criminal activity.'" *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (quoting *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005)).

In its Response, the Government argues that the following circumstances known to Corporal Taylor at the time he searched Mr. Sigala-Baray amount to reasonable suspicion that Defendant was armed and dangerous: (1) Defendant's criminal history;

(2) Defendant's "overly 'friendly'" demeanor during the stop; and (3) Defendant's change in demeanor "once he realized a search was to occur."  [Doc. 20 at 7–8].  At the hearing, Corporal Taylor testified that Defendant was "known to carry weapons," [Hearing Tr. at 8:6–11], and the Government cited this as an additional basis supporting reasonable suspicion in its oral argument, [*id.* at 73:24–25].  Corporal Taylor also testified that it was "concerning" that the license plate came back to a different car, [*id.* at 13:8–12], which the Government too referenced in its reasonable suspicion argument, [*id.* at 74:7–13].

Below, the Court addresses each factor separately to consider the weight properly afforded to it.  Although the Court discusses each relevant factor separately, the Court does not consider the relevant circumstances in isolation.  *See United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014).  Rather, after discussing each factor in detail, the Court determines whether the totality of the circumstances—the "whole picture"— demonstrates that there was reasonable suspicion that Defendant was armed and dangerous.  *See Daniels*, 101 F.4th at 777–84 (deciding the weight properly afforded to each fact known to officers before considering the totality of the circumstances); *see also United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019) ("We evaluate each factor alleged to support an inference of reasonable suspicion separately and in the aggregate.").

### A.    Defendant's Change in Demeanor

The Government argues that before Corporal Taylor "could even frisk the defendant, his friendly demeanor abruptly changed to frustration once he realized a search was to occur."  [Doc. 20 at 8].  Generally speaking, a suspect's change in demeanor could be relevant to the reasonable suspicion analysis.  *See, e.g.*, *United*

*States v. Diaz*, No. 07-cr-00701-LH, 2008 WL 11428239, at *6 (D.N.M. May 14, 2008) (considering, among other factors, the defendant's change in demeanor); *United States v. Cantero*, No. 18-cr-00105-MSK-GPG, 2019 WL 181298, at *7 (D. Colo. Jan. 14, 2019) (same).

Here, however, the Court is not persuaded that this factor carries any weight at all. The Court must determine whether there reasonable suspicion that Mr. Sigala-Baray was armed and dangerous "at the time [Corporal Taylor] decided to frisk [Mr. Sigala-Baray] for weapons." *Hammond*, 890 F.3d at 905; *see also Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). As explained above, Corporal Taylor placed his hands on Defendant to search him as Defendant was exiting the vehicle, and it was not until after Corporal Taylor held Mr. Sigala-Baray's arm and announced the frisk that any purported change in demeanor occurred. *See* [Doc. 18-2 at 19:57:20]; *see also* [Doc. 18-1 at 3 (Corporal Taylor stating in his report that *"[a]s Jorge exited the truck* I stopped him, *held his left arm* and told him that before he walked away, I was going to pat him down for weapons" (emphasis added))]. Because the evidence shows that Corporal Taylor decided to frisk Mr. Sigala-Baray *prior to* Mr. Sigala-Baray's purported change in demeanor, this factor is not relevant to the Court's analysis, and the Court does not consider it. *See United States v. Nance*, No. 5:24-cr-40017-TC, 2024 WL 3179684, at *5 (D. Kan. June 26, 2024) ("[The officer] had already concluded that she was going to frisk [the defendant] by this time. As a result, this behavior could not have been considered as part of the reasonable suspicion analysis."); *cf. United States v. Gonzalez*, 121 F. Supp. 3d 1094, 1179 n.44 (D.N.M. 2015) (finding the defendant's change in demeanor

"irrelevant to the reasonable suspicion analysis" because the officers had unreasonably prolonged the traffic stop prior to the behavioral change).

### B.   Defendant's "Overly Friendly" Demeanor

The Government also argues that Mr. Sigala-Baray was "overly" friendly during the traffic stop, "which was notable because it was contrary to his behavior in earlier encounters with not only other officers, but specifically with [Corporal] Taylor." [Doc. 20 at 8]. Defendant contends, however, that his behavior "was neither overly effusive nor peculiar" and that he was simply matching Corporal Taylor's friendliness during their interaction. [Doc. 18 at 7]. And at the hearing, Defendant asserted that his behavior was not unusual or suspicious given the numerous interactions Defendant had had with Corporal Taylor. [Hearing Tr. at 67:15–68:12]. He also argued that courts recognize that overly friendly behavior is an indicium of nervousness, and that nervousness "should receive minimal consideration and should be afforded little weight because it is sufficiently common and . . . therefore of limited significance." [*Id.* at 68:13–18].

As a preliminary matter, the Court agrees with Defendant that "overly friendly" behavior may be a sign of, or analyzed similarly to, nervousness. *See, e.g.*, *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (discussing the defendant's "suspicious conduct," such as his "nervous, talkative, and overly-friendly behavior"); *United States v. Brown*, 234 F. App'x 838, 846 (10th Cir. 2007) (considering that the defendant was "extremely nervous with shaky hands" and "overly talkative" in reasonable suspicion analysis); *United States v. Smith*, No. 22-10489, 2022 WL 17958923, at *5 (11th Cir. Dec. 27, 2022) (finding reasonable suspicion based on, among other factors, the defendant's "behavior during the stop (e.g., overly friendly, nervous, breathing rapidly . . .)").

The Tenth Circuit has "repeatedly held that nervousness is of limited significance in determining reasonable suspicion," and any reliance on nervousness "must be treated with caution." *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994). "It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997). "[U]nless an individual's display of nervousness "is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." *Kitchell*, 653 F.3d at 1220 (quoting *Santos*, 403 F.3d at 1127). The Court concludes that this same level of caution must be applied with equal force to Defendant's "overly" friendly behavior.

The Court is mindful that "the officer (and not the court) was present at the encounter, and the officer (and not the court) has the training and experience to evaluate and compare the reactions of motorists to questioning." *Santos*, 403 F.3d at 1128. However, the Court must "examine specific indicia that the defendant's [behavior] was extreme, rather than credit an officer's naked assertion," *United States v. Simpson*, 609 F.3d 1140, 1148 (10th Cir. 2010), and a review of the video evidence does not demonstrate that Mr. Sigala-Baray was acting in any unusual or excessively friendly manner, *Kitchell*, 653 F.3d at 1220. Rather, Mr. Sigala-Baray simply exchanged pleasantries and small talk with Corporal Taylor, with the conversation progressing through equal participation from both men. *See* [Doc. 18-2 at 19:51:46 ("Hey, Georgie"); *id.* at 19:52:20 ("You working at the sugar factory again, or no?")].

Moreover, while the Court acknowledges Corporal Taylor's testimony that Mr. Sigala-Baray's behavior was "unlike" his prior interactions with Defendant, *see* [Hearing Tr. at 12:1–15]; *see also* [Doc. 18-1 at 3 ("[Mr. Sigala-Baray] is not normally this friendly.")], Corporal Taylor never described with particularity Defendant's demeanor during their prior encounter(s) or explained how Defendant's friendliness was markedly different from his past behavior. In fact, Corporal Taylor testified that during the only law enforcement interaction he had had with Defendant previously, Defendant was "compliant" and "polite," and that he had "complied and was arrested and then actually apologized for his sister being extremely out of line." [Hearing Tr. at 9:7–13, 38:9–39:3].[7]

At bottom, the Government's and Corporal Taylor's characterization of Mr. Sigala-Baray's demeanor is not supported by the video evidence. Although the Court must give deference to an officer's judgment, such deference "is not unlimited." *Simpson*, 609 F.3d at 1147. "[S]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Id.* (quotation omitted). Mr. Sigala-Baray's

---

[7] The Court is cognizant that it ordinarily must give deference to an officer's perception of an encounter. *Frazier*, 30 F.4th at 1174; *Santos*, 403 F.3d at 1128. However, the Court observes that the police report from the single prior law enforcement interaction between Defendant and Corporal Taylor, which occurred in 2019, depicts a conversational demeanor from Defendant. *See, e.g.*, [Hearing Ex. 6 at 5–7 ("Jorge kept saying that he was sorry and that he just wanted to talk to his wife, because he knew he was going to jail. . . . While they prepared for the K9 search, I talked to Jorge in the caged seat of my patrol unit. . . . Jorge told me that he had a suspended driver's license and was on parole with PO Leslie Kiesel. . . . As I transported Jorge to jail he continued to tell me that [his sister] 'shouldn't have acted like that, she shouldn't have approached you guys like that,' "all that bullshit about I know my rights she's just fucking dumb.' Jorge called her an 'emotional girl' and that he knows it is 'different when you're approaching an officer, know what I'm saying.' Jorge continued to apologize for his sister and take responsibility for his actions. Jorge continued to talk about his sister, Sarah, and I told him I was not mad, I just did not understand why she had to stick her nose in to the situation and I told her to leave. Jorge agreed with me and said that he had heard me loud and clear about that.")].

unremarkable behavior during the mere minutes-long interaction with Corporal Taylor does not alone give rise to reasonable suspicion, and will be afforded only "limited significance."  *Kitchell*, 653 F.3d at 1220; *see also Nance*, 2024 WL 3179684, at *3 (giving little weight to officer's observation of nervousness because "[t]he video of the stop fail[ed] to capture any of the nervousness that [the officer] claim[ed] to have seen or that would lead a reasonable officer to believe [the defendant] was armed and dangerous"). Accordingly, while the Court will consider Defendant's unremarkably friendly demeanor in its analysis of the totality of the circumstances, it limits the weight afforded to this factor and finds that it carries only minimal, if any, significance.  *Daniels*, 101 F.4th at 778; *cf. also Santos*, 403 F.3d at 1133 (finding that one factor with "many wholly innocent explanations" "add[ed] nothing to the calculus").

### C.    General Knowledge that Defendant Carried a Gun

In his report, Corporal Taylor stated that "it has been common knowledge that [Mr. Sigala-Baray] may be carrying a gun on him."  [Doc. 18-1 at 3].  Similarly, at the hearing, Corporal Taylor made generalized statements that Defendant was "known" to carry a gun. *See* [Hearing Tr. at 8:4–9; *id.* at 14:10–11 ("I have been told since I started [at the Sterling Police Department] that [Defendant is] known to carry weapons.")].  Corporal Taylor stated that this belief was not based on Corporal Taylor's *own* interactions with Defendant, but rather statements from other, unidentified officers; in Corporal Taylor's singular law enforcement interaction with Defendant, which occurred in 2019, Defendant was not armed.  *See* [*id.* at 38:13–39:21].

The Government does not argue in its Response that this is a factor lending support to reasonable suspicion that Mr. Sigala-Baray was armed and dangerous at the

time of the frisk.  *See* [Doc. 20].  But at the hearing, the Government argued that the Court should consider that "[t]here [were] also multiple reports of [Defendant] being in possession of firearms."  [Hearing Tr. at 73:23–25].  Specifically, the Government relies on two specific instances:  a 2023 "bar fight" and a 2024 allegation that Mr. Sigala-Baray had fired a gun at another person.

   ***The 2023 Bar Fight.***  When he was asked at the hearing what he knew about Defendant prior to the August 2024 traffic stop, Corporal Taylor stated that he knew that Mr. Sigala-Baray "had been knocked out at a bar fight and a gun had been found next to him or seen next to him."  [*Id.* at 7:21–8:11].  Corporal Taylor also testified that his "only information" about that incident was that Mr. Sigala-Baray was knocked out at a bar and a gun was found nearby.  [*Id.* at 41:6–8].  He later stated, however, in response to a question from the Government, that the information he had about the 2023 fight was that Mr. Sigala-Baray "had a gun on his person."  [*Id.* at 50:21–24].  No police reports were filed in response to that bar fight, [*id.* at 17:21–23, 40:7–13], and Corporal Taylor agreed that the call note created in relation to the fight "makes clear that it is Mr. Sigala who was the victim of [an] assault," [*id.* at 40:16–18]; *see also* [Doc. 31-1 at 4 (call note stating that Mr. Sigala-Baray had been punched and knocked out and the suspect took off, and that a witness had said that "there was a handgun lying next to [Mr. Sigala-Baray] after her [sic] was knocked out so he must have had the gun in the bar")].

   Taking the call note from the 2023 fight at face value, it reveals that (1) Mr. Sigala-Baray was punched outside of a bar; and (2) a gun was found near him when he was unconscious.  [Doc. 31-1 at 4].  However, there is nothing in that document suggesting that any witness saw Mr. Sigala-Baray with a gun or observed the gun falling from Mr.

Sigala-Baray's person; the only information is that a witness *speculated* that Mr. Sigala-Baray "must have had" the gun because it was found near him.  *See* [*id.*].  Moreover, the Court notes that Corporal Taylor repeatedly stated at the hearing, when describing his knowledge of the 2023 fight, that a gun was simply found near Mr. Sigala-Baray.  [*Id.* at 8:10–11 ("a gun had been found next to him or seen next to him"), 14:6–7 (referencing "the gun being by him at the bar when he got knocked out"), 40:7–9, 41:6–8 (agreeing that his "only information" was that Mr. Sigala-Baray "got knocked out at a bar and there was a gun found nearby")].  It was not until a leading question from the Government that Corporal Taylor stated his belief that Mr. Sigala-Baray "had a gun on his person."  [*Id.* at 50:21–24].

Furthermore, and notably, the 2023 incident is not mentioned in Corporal Taylor's incident report from the August 2024 arrest, *see* [Doc. 18-1], nor is it mentioned in the Government's April 18, 2025 Response, *see* [Doc. 20].  But a document described as a "summary" of a conversation between Corporal Taylor and ATF Task Force Officer Trevor Gilmore—occurring on April 16, 2025 (after the Motion to Suppress was filed)—states that, with respect to Corporal Taylor's knowledge that Mr. Sigala-Baray was "known to carry a firearm," Corporal Taylor "recalled a case where [Defendant] was involved in a physical altercation with someone in a bar where he was knocked to the ground and a gun went flying from [Defendant's] person."  [Doc. 20-1 at ¶ 1].  At the hearing, Corporal Taylor acknowledged that the first time he mentioned the 2023 incident was in his conversations with Officer Gilmore.  [Hearing Tr. at 46:5–7].  In other words, it was not until approximately *eight months* after his frisk and subsequent arrest of Mr. Sigala-Baray that Corporal Taylor offered this as an additional justification for the frisk.

While the Court considers this factor in its totality of the circumstances analysis, it does so within the context of the above observations—mainly, that the 2023 fight was not mentioned in the incident report and not cited as a justification by Corporal Taylor until after the Motion to Suppress was filed; that the secondhand report recounts that a gun was found near, not on, Mr. Sigala-Baray; and that the secondhand report simply reiterates a witness's speculation that the gun was in Mr. Sigala-Baray's possession before he was knocked out—and adjusts the weight afforded this factor accordingly.  *Cf. United States v. Warwick*, No. 16-cr-04572-MCA, 2017 WL 3822076, at *18 (D.N.M. Aug. 30, 2017) (declining to consider post hoc justification for search where it was only mentioned during a hearing "in response to a leading question from the Government"), *aff'd*, 928 F.3d 939 (10th Cir. 2019).

*The 2024 Allegation.*  The Government also relies on "a report from June 2024 that alleged the defendant had been in possession of a firearm and used it to beat up another individual that [Corporal] Taylor investigated, but ultimately could not corroborate."  [Doc. 20 at 7–8].  At the hearing, Corporal Taylor explained:

> [I]n June [2024], we got called to a male that was laying in the street bleeding, his name was Adrian Barron and when we got there Mr. Barron was bleeding from the head, was highly intoxicated, claiming that people were hurting him and he claimed that Mr. Baray had shot at him and then he continually said how he wanted us either kick in Mr. Baray's door or fight Mr. Baray and he was going to handle this on his own, and that they were going to figure out which of either the cartel or gang was the more tough. He was very adamant about fighting Mr. Baray.
>
> . . .
>
> Q.  Did you find any evidence of a shooting?
>
> A.  No.

Q.  Now, but prior to the stop of the defendant that day, was that incident still in your mind?

A.  Yes.

[Hearing Tr. at 9:14–11:1].  Corporal Taylor later agreed that "all [of Mr. Barron's] claims against Mr. Sigala were uncorroborated."  [*Id.* at 41:20–22].  Corporal Taylor also found no evidence of gun shots being fired and there were no other reports of shots fired.  [*Id.* at 42:22–43:1].  The only corroborating evidence Corporal Taylor obtained was that a witness observed "two guys arguing in the street," but he testified that he could not say whether Mr. Sigala-Baray was involved in that argument or whether a gun was involved.  [*Id.* at 43:5–14, 44:5–9].

"Reasonable suspicion . . . is dependent upon both the content of information possessed by police and its degree of reliability."  *Alabama v. White*, 496 U.S. 325, 330 (1990).  The Court finds Mr. Barron's report somewhat analogous to an anonymous tip reported to law enforcement.  In cases discussing the reliability of anonymous tips and whether reasonable suspicion arises therefrom, courts consider the following non-dispositive factors to decide whether an anonymous tip is reliable:  (1) whether the informant was truly anonymous or whether the police knew some details about the informant; (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.  *Daniels*, 101 F.4th at 777.

Here, (1) officers knew Mr. Barron's identity and he was not anonymous; and (2) Mr. Barron provided contemporaneous information, but (3) Mr. Barron was "highly intoxicated" at the time of his report, [Hearing Tr. at 9:19–21; Doc. 20-2 at 8, 15]; and

(4) Mr. Barron gave "a lot of separate comments and changing of different details of what actually happened," "his story was changing," and he was "not telling [officers] what the details were," [Doc. 20-2 at 1, 5].  Moreover, officers, including Corporal Taylor, could not corroborate Mr. Barron's claims:  specifically, (5) an eye witness reported that Mr. Barron had been punched in the face and "fell back and hit his head and got knocked out on the ground," which an investigating officer found was "very consistent with [Mr. Barron's] injuries and what was observed on scene, rather than him getting pistol whipped or shot at," [*id.* at 1]; (6) investigating officers found "nothing consistent" with allegations of shots fired, [*id.* at 5]; (7) Corporal Taylor stated in his report that Mr. Barron's claims were "unfounded," [*id.* at 11]; and (8) Corporal Taylor testified that Mr. Barron's claims were "uncorroborated" and that he did not do any follow up investigation that led to charges against Mr. Sigala-Baray, [Hearing Tr. at 41:20–22, 45:4–6].

In light of all of the circumstances calling the reliability of Mr. Barron's allegation into question, in addition to the fact that Corporal Taylor's own investigation of the allegation yielded essentially no corroborating evidence, the Court affords Mr. Barron's report little weight, given that it lacks essentially any indicia of reliability—and thus, has only minimal utility to the Court's reasonable suspicion analysis.  *See Daniels*, 101 F.4th at 778 (affording anonymous 911 call little weight for lack of utility).

Finally, the Court turns to Corporal Taylor's generalized, secondhand, vague knowledge that Mr. Sigala-Baray was "known" to carry weapons.  [Hearing Tr. at 8:8–9].  Neither Corporal Taylor's testimony nor his incident report included any particularized information about *what* was known to him about Mr. Sigala-Baray's supposed carrying of weapons.  And again, in Corporal Taylor's one prior law enforcement interaction with Mr.

Sigala-Baray, Defendant was not armed. [*Id.* at 38:13–39:21]. And strikingly, the Government does not argue or provide any evidence demonstrating that there was a contemporaneous event in a nearby geographic area that either allegedly involved Mr. Sigala-Baray or any other armed individual (i.e., there is no evidence in the record that Corporal Taylor was on alert for someone carrying a gun in the area at the time of the traffic stop). While the Court considers this factor in its review of the totality of the circumstances, this generalized knowledge is insufficient alone to create reasonable suspicion, which "may not be derived from inchoate suspicions and unparticularized hunches." *United States v. Lyons*, 510 F.3d 1225, 1237 (10th Cir. 2007) (quotation omitted); *see also United States v. Goodwin*, 2000 WL 64972, at *4 (6th Cir. 2000) (explaining why the officer's alleged recognition of the defendant "being associated with drug trafficking in the community," which was information received by the officer over a year prior "from an unidentified source," was insufficient to support reasonable suspicion that the defendant was armed and dangerous); *id.* at *12–13 (Gadola, J., concurring) ("Such 'facts' . . . are too remote and fragile to lead to a conclusion that the deputy's suspicion was reasonable.").

    **D.    License Plates**

    The Government also argued at the hearing that Corporal Taylor "ha[d] a potential stolen car investigation going on" because the license plates were reported back to a Ford F-150, not the Ford Expedition Defendant was driving. [Hearing Tr. at 74:7–8]. The Government contended that it is "established by case law" that "a stolen car investigation [is] a higher dangerous situation," [*id.* at 74:22–24], but the Government cited no such authority in its brief or at the hearing, and the Court could locate no cases recognizing a

foolproof connection between a potential stolen vehicle investigation and reasonable suspicion that the driver is armed and dangerous.

At the hearing, Corporal Taylor stated that the mismatched plates concerned him: "[I]s it just fictitious plates, so is this criminal right now, or is the vehicle stolen with a plate put on it to cover up theft?"  [*Id.* at 13:8–12].  But Corporal Taylor went on to immediately explain that, "to figure out . . . the situation . . . with the license plate," he chose to look at the vehicle's VIN.  [*Id.* at 13:13–15].  Corporal Taylor did not provide any testimony explaining why, based on his experience and training, the license plate discrepancy created reasonable suspicion that Mr. Sigala-Baray was armed and presently dangerous. *See generally* [*id.*].  Thus, while the Court credits Corporal Taylor's testimony that he generally considered that the car might be stolen, this rationale alone does not provide reasonable suspicion that Defendant was armed and dangerous.  *Cf. Frazier*, 30 F.4th at 1176 ("Our deference to law enforcement judgment extends to reasonable inferences drawn from specific, articulable facts, not inchoate suspicions and unparticularized hunches.").

### E.    General Knowledge of Defendant's Prior Criminal Involvement

Defendant's criminal history of one of the bases cited in the Government's Response as providing reasonable suspicion for the frisk.  [Doc. 20 at 3].  "An officer's knowledge of past criminal conduct is probative of whether the defendant is armed and dangerous, especially if a weapon was involved."  *Garcia*, 751 F.3d at 1145.  But "knowledge of a person's prior criminal involvement . . . is alone insufficient to give rise to the requisite reasonable suspicion."  *Sandoval*, 29 F.3d at 542.  If that knowledge is

coupled "with other factors that do foster a reasonable suspicion of current criminal activity," though, then the reasonable suspicion threshold may be met. *Id.*

At the hearing, Corporal Taylor testified that he "ha[d] been told over the course of [his] career . . . that Mr. Baray is a known gang member, . . . ha[s] [a] violent criminal past," and "was a felon." [Hearing Tr. at 8:4–16]. However, Corporal Taylor did not "know specifics" of Defendant's criminal history. [*Id.* at 8:17–18]. In particular, Corporal Taylor did not know when Defendant had been arrested for felony charges or what the felonies were. [*Id.* at 35:1–11]. Similarly, Corporal Taylor did not provide any specifics about his knowledge that Mr. Sigala-Baray is a gang member. *See* [*id.* at 8:7–8]. And Corporal Taylor's incident report mentions gang membership only in the context of Mr. Sigala-Baray's statements *after* his arrest. *See* [Doc. 18-1 at 5]. The report states that Mr. Sigala-Baray "would not tell [officers] which street gang he was specifically a member with currently," [*id.*], which too suggests a lack of specific knowledge about Defendant's purported gang connections.

Both a suspect's criminal history and gang ties are relevant to whether there is reasonable suspicion that the suspect is armed and dangerous. *Garcia*, 751 F.3d at 1145; *see also United States v. House*, 463 F. App'x 783, 787 (10th Cir. 2012) ("involvement in gang activity" may be supportive of reasonable suspicion that person is armed and dangerous). However, this alone is insufficient to create reasonable suspicion, *Sandoval*, 29 F.3d at 542, and the Court generally affords limited weight to this factor given the frisking officer's lack of specific, personalized knowledge of Defendant's criminal history or gang involvement, *cf. United States v. Brinson*, No. 1:19-cr-00096-JRH-BKE, 2019 WL 7476672, at *4 (S.D. Ga. Dec. 4, 2019) ("This conclusion [that criminal history alone does

not give rise to reasonable suspicion] applies more forcefully here because Deputy Snyder had no information to suggest a prior drug conviction, but instead only a prior drug arrest with no disposition information available."), *report and recommendation adopted*, 2020 WL 59728 (S.D. Ga. Jan. 3, 2020).

F.     **Totality of the Circumstances**

"The totality of the circumstances test looks at the officer's knowledge and observations as well as the circumstances in which the officer is working." *Garcia*, 751 F.3d at 1143. The reasonableness of the officer's conduct is evaluated using an objective standard, considering "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *McHugh*, 639 F.3d at 1256 (cleaned up).

The record shows that the following circumstances were known to Corporal Taylor at the time he chose to frisk Mr. Sigala-Baray, based on secondhand, generalized, or uncorroborated information: (1) he knew, generally, that Mr. Sigala-Baray had been arrested for "violent felonies," but did not know what the felonies were or when Defendant was arrested; (2) he knew, generally, that Mr. Sigala-Baray was a gang member, but did not know the details; and (3) he knew, generally, that Mr. Sigala-Baray was "known" to carry a gun, but in his own law enforcement encounter with Mr. Sigala-Baray, Defendant was not armed. In addition, Mr. Sigala-Baray (4) was generally, but unremarkably, friendly in the few minutes Corporal Taylor spoke with him; and (5) was driving a Ford Expedition with license plates that were (erroneously) tied to a different car, but Ms. Sarmiento stated that the car was hers and that she carried insurance for the car. And with respect to the general atmosphere of the stop, the Court observes that (6) the traffic

stop was not made in a high-crime area, [Hearing Tr. at 4:11–16]; (7) there were multiple officers at the scene, [Doc. 18-2 at 19:54:10, 19:56:17]; and (8) the stop occurred on a public street just before 8:00 p.m. and the sun had not yet set, [*id.* at 19:51:46]; *see also Gurule*, 935 F.3d at 887 (noting that "[t]he time and the place of the traffic stop [also] contribute to the reasonableness of the pat-down search," and holding that the time of day (10:30 p.m.) and the fact that the stop occurred in a high-crime area supported reasonable suspicion); *United States v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016) ("the time of day when and the place where the pat-down occurred" are relevant to determining whether there was reasonable suspicion that suspect was armed and dangerous). These factors must be considered by the Court, too. *See Daniels*, 101 F.4th at 783–84 ("The district court [i]s not only empowered, but *required*, to evaluate all the factors in the record when analyzing reasonable suspicion, including facts militating against reasonable suspicion.").

To frisk Mr. Sigala-Baray without a warrant, Corporal Taylor needed a particularized and objective basis to believe that Mr. Sigala-Baray was armed and presently dangerous. The above circumstances, considered in the aggregate, do not satisfy that requirement. Neither Mr. Sigala-Baray's demeanor nor the license plate discrepancy, in light of all of the circumstances known at the time of the frisk, suggest that Mr. Sigala-Baray was then armed and presently dangerous. And the reports related to the 2023 fight and the 2024 allegation of shots fired are entirely uncorroborated (if not outright discredited, with respect to the 2024 allegation) and are, respectfully, "far too flimsy to be afforded any weight." *Frazier*, 30 F.4th at 1177; *see also United States v. Landell*, No. 07-cr-00063-MCA, 2007 WL 2712962, at *7 (D.N.M. June 22, 2007) ("The

uncorroborated testimony of a witness who cannot credibly and consistently recollect the details of a traffic stop is not sufficient to meet the Government's burden of proving that the stop was founded on reasonable suspicion or probable cause.").

That leaves the generalized, secondhand knowledge that Mr. Sigala-Baray was a felon or had prior criminal involvement and the generalized, secondhand knowledge that Mr. Sigala-Baray was known to carry a gun—none of which is based on Corporal Taylor's personal knowledge or experience, but on an ill-explained understanding about Defendant as a person.  These factors merit minimal weight individually, and even considered together do not give rise to reasonable suspicion that Mr. Sigala-Baray was armed and dangerous.  Indeed, courts "have long been cautious about accepting conclusions that were arrived at by piling inference upon inference."  *United States v. Jones*, 998 F.2d 883, 886 (10th Cir. 1993) (quotation omitted).  The Government's basis for reasonable suspicion is just that—a serious of unparticularized hunches that, even taken together, are still just hunches.

The Government's position essentially boils down to this:  a suspect with a reputation can *always* be frisked.  But the Fourth Amendment does not provide carte blanche to search a felon, or a gang member, simply based on that criminal history or involvement.  "Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches."  *Santos*, 403 F.3d at 1132; *see also House*, 463 F. App'x at 789 ("To allow a search based on the hunch that a citizen walking down the street is illegally carrying a firearm, without more, serves to erode the precious protections of the . . . Fourth Amendment[].").  "If the law were otherwise, any person with any sort of criminal record . . . could be subjected to a *Terry*-type investigative stop [or

frisk] by a law enforcement officer at any time without the need for any other justification at all." *Sandoval*, 29 F.3d at 543. Such a rule "would clearly run counter to the requirement of a reasonable suspicion," *id.*, and the guiding principle of *Terry* that the Government must articulate "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion," *Terry*, 392 U.S. at 21.

Because there were no specific, articulable facts sufficient to create reasonable suspicion that Defendant was armed and dangerous, the frisk of Mr. Sigala-Baray violated his Fourth Amendment rights. Accordingly, the Motion to Suppress is **GRANTED**.[8] Evidence of the handgun and statements resulting from the pat-down search is **SUPPRESSED**.

## CONCLUSION

For the reasons set forth above, it is **ORDERED** that:

(1)   The Motion to Suppress Illegally Obtained Evidence [Doc. 18] is **GRANTED**;

(2)   All evidence seized from the search of Mr. Sigala-Baray's person, including the handgun and any statements flowing from the search, is **SUPPRESSED**; and

(3)   On or before **June 13, 2025**, the Parties shall meet and confer with respect to the requirements of the Speedy Trial Act and shall file a joint status report setting forth their position(s) as to the applicable Speedy Trial Act

---

[8] The Government does not argue that an exception to the exclusionary rule applies. *See* [Doc. 20].

calculation.  After receiving the status report, the Court will re-set this case for trial.

DATED:  June 9, 2025                          BY THE COURT:

                                              Nina Y. Wang
                                              United States District Judge